CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
2/7/2023
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
      DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 6:22-cr-00006 |
| v. | MEMORANDUM OPINION & ORDER |
| KENDALL DEAN SIMONTON, | |
| *Defendant.* | Judge Norman K. Moon |

This matter is before the Court on Defendant Kendall Dean Simonton's motion to suppress. Dkt. 54. The motion will be denied. The officers saw narcotics and contraband in plain view during the course of a lawful protective sweep of the hotel room where Defendant and his codefendant Mackenzie Brannan were staying, when the officers respond to a domestic violence call. The Supreme Court's decision in *Maryland v. Buie*, 494 U.S. 325 (1990), permitted this very sort of protective sweep. Defendant's motion to suppress is without merit.

## Background

On November 23, 2021, Officer Miller, Officer Pavia, and Officer Hubbard of the Lynchburg Police Department responded to domestic violence in progress call at a Super 8 Hotel (Room 219) in Lynchburg. *See* Dkt. 56 at 1–2; Dkt. 54 at 1.

Officer Miller approached the room, knocked, and announced: "Lynchburg Police Department." A male voice (Simonton) said the officers had the wrong room. Gov't Ex. 2 at 0:30–0:45. Officer Miller asked the occupants to open the door and the male said that his wife was in the shower. *Id.* at 0:45–1:00. After the occupants were asked to open the door several more times, Officer Pavia unlocked the door with a keycard provided by motel management, but

1

the door only opened slightly because the deadbolt was latched. *Id.* at 1:00–1:20. Officer Miller again commanded several times, "Open the door," to which a female voice (Mackenzie Brannan) responded, "Okay. I need to close the door to open it." The couple unlatched the deadbolt and opened the door. *Id.* at 1:20–1:30.

When the door opened, the officers found Simonton and Brannan in the room standing in the doorway. Gov't Ex. 3 at 1:35–1:45. Brannan was wearing only a towel and her nostril was red and bleeding. *Id.*; *see also id.* at 2:15–2:30. Officer Miller told Simonton to "come out here" several times. Simonton initially refused, saying "I'm in my room minding my own business. Can you tell me what it is you [want]?" Gov't Ex. 4 at 0:55–1:10. Eventually, Simonton acquiesced and stepped out into the hallway, carrying a cigarette. *Id.* at 1:10–1:20. The officers took it from Simonton and Officer Miller handcuffed him behind his back. *Id.* at 1:20–1:30. Officer Miller told Simonton that he was "not under arrest" but was "being detained." Gov't Ex. 2 at 2:05–2:15. Officer Miller asked Simonton what was going on since there was "screaming and yelling" and it "sound[ed] like someone's being beat on." *Id.* at 2:30–2:35. Simonton denied there was any fighting: "That's not us." *Id.* Officer Miller continued, "I was sitting here listening to you …," to which Simonton responded, "no you wasn't." *Id.* at 2:35–2:40.

Just inside the hotel room, Officers Pavia and Hubbard stood with Ms. Brannan. Officer Hubbard asked Ms. Brannan, "is there anyone else in here?" Ms. Brannan responded, "No." Gov't Ex. 4 at 1:20–1:30. Then, Ms. Brannan said, likely mentioning her bloody nose, "this is not from [Simonton], I got into a fight last night." *Id.* at 1:30–1:37. When Officer Hubbard looked into the room, Ms. Brannan said, "It's just me and him [i.e., Simonton] … we just started

2

renting the room yesterday." *Id.* at 1:40–1:50. Officer Hubbard asked again, "Is anyone else in here?" Ms. Brannan responded, "No." *Id.* at 1:50–1:55. *See also* Gov't Ex. 3 at 2:20–2:40.

Officer Hubbard then entered the hotel room for what the Government characterizes was a "protective sweep." Dkt. 56 at 3; Gov't Ex. 4 at 2:00. Officer Hubbard announced, "Police Department," as he walked into the room. Gov't Ex. 4 at 1:50–1:55. Ms. Brannan complained saying, "I'm confused why y'all are looking through everything." Officer Pavia responded, "We're just making sure no one else is in this room. Someone called 911 and said there was screaming." *Id.* at 1:55–2:05. Officer Pavia also said the caller "could hear him hitting you." *Id.*; *see also* Gov't Ex. 3 at 3:00–3:10.

Officer Hubbard's protective sweep of the hotel room lasted a little over a minute. Gov't Ex. 4 at 1:55–3:05. He initially proceeded towards the back of the hotel room and then paused in between the beds, appearing to shine his flashlight under the bed and on various items on the floor. *Id.* at 2:05–2:20. Officer Hubbard then turned around and saw methamphetamine located in plain view on a desk opposite the beds. *Id.* at 2:18–2:32. Soon thereafter, Officer Hubbard returned to the front of the room where Officer Pavia and Ms. Brannan were located. *Id.* at 2:32–2:48. Once back at the entrance, Officer Hubbard then periodically shined the flashlight back into the room, including on a table nearest to the door (and him), which appeared to have drug paraphernalia on it. *Id.* at 2:55–3:08.

Once Officer Hubbard came back to the room's entrance, Ms. Brannan asked to return to the shower so she could get dressed. Gov't Ex. 3 at 3:40–3:50. The officers asked if she had a robe and, because there wasn't one, said they could get her clothes to get dressed and offered to let her change in the bathroom. *Id.* at 3:50–4:05. Officer Pavia and Ms. Brannan then had the following exchange:

3

> Officer Pavia: Let me check, if you don't mind stepping out here. I'll check the bathroom real quick, we'll give you some clothes, and you can get changed in there.
>
> Ms. Brannan. Ok.
>
> Officer Pavia: As long as there's nothing in the bathroom we—we can't have you around … yep, a gun, exactly why we weren't letting her in here.

*Id.* When Officer Pavia entered the bathroom, he immediately found a gun on the counter beside the sink. *Id.* Ms. Brannan claimed it was her own ("that's mine") and told the officers she had a concealed carry permit and no prior felonies. *Id.* at 4:05–4:10. Ms. Brannan also tried to tell the officers why she had the gun, and further that Simonton did not know that she had the gun.[1] *Id.* at 4:20–4:30.

The officers subsequently conducted a field test of the suspected methamphetamine, which tested positive, and thereafter secured a search warrant for the hotel room. *See* Dkt. 56 at 4–5 & Gov't Ex. 5. The officers recovered about 490 grams of methamphetamine, as well as a Taurus handgun, digital scales, and other narcotics. *See* Gov't Ex. 8. Simonton and Brannan were taken into custody.

Defendant Simonton was indicted on multiple counts. Relating to November 23, 2021, Simonton was charged with possession with intent to distribute more than 50 grams of methamphetamine (Count 1), and two counts related to conduct two days prior (November 21, 2021), specifically knowing possession and discharge of a firearm in furtherance of a drug trafficking crime (Count 2), and unlawful possession of a firearm by a felon (Count 4). His codefendant Brannan was indicted for knowing possession of a firearm in furtherance of a drug trafficking crime on November 23, 2021 (Count 3). *See* Dkt. 44.

---

[1] Shortly thereafter, a female officer arrived to watch over Ms. Brannan in the hotel room while she got changed outside the presence of the male officers.

Motion to Suppress

Defendant filed a motion to suppress arguing that the police conducted "an unlawful entry and search of his hotel room in violation of the Fourth Amendment." Dkt. 54 at 1. Therein, Defendant writes that, on November 23, 2021, police responded to a "domestic violence in progress" at his hotel room at the Super 8, and when they arrived, police "demanded that the occupants open the door." *Id.* "Eventually, the door was opened revealing two occupants, one being [Defendant], the lessee of the room." *Id.* at 2. Defendant asserts that "[b]oth occupants said there was no one else in the room and neither consented to the officers' entry into the room." *Id.* Defendant further argues that, thereafter, "two officers enter[ed] the room, without a warrant or probable cause, and searched the room, ostensibly to 'make sure no one was still in distress inside the room.'" *Id.* But, he argues, during this "illegal search," "items of contraband were seen in plain view and these items were the basis of a subsequent search warrant." *Id.* Accordingly, Defendant concludes that there was no warrant or probable cause or "exigent circumstances," justifying the initial sweep of the room.

In response, the Government argues that the "terms of the dispute, then, are clear: whether or not the officers were entitled to conduct—and whether they did, in fact, conduct—a protective sweep of [Defendant's] motel room after arriving on the scene and detaining him." Dkt. 56 at 6–7. The Government contends that "the officers lawfully undertook the sort of protective sweep courts routinely authorize and uphold, and the methamphetamine and firearm officers saw in plain view provided sufficient probable cause for the later search warrant." *Id.* at 7. The Government's argument supporting the "protective sweep" is based on *Maryland v. Buie*, 494 U.S. 325, 334 (1990)—not the "exigent circumstances" doctrine.

This Court heard argument and took testimony and other evidence at a hearing on Defendant's motion to suppress.

Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are generally unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). These protections apply to persons renting hotel rooms. *Stoner v. State of California*, 376 U.S. 463, 490 (1964) ("No less than the tenant of a house, or the occupant of a room in a boarding house … a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures."); *United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir. 1997) ("A guest in a hotel room has a reasonable expectation of privacy.").

There is a "well-settled protective sweep exception to the warrant requirement." *United States v. Jones*, 667 F.3d 477, 482 (4th Cir. 2012). The Supreme Court articulated this exception in *Buie v. Maryland*, 494 U.S. 325 (1990). In *Buie*, following an armed robbery, the police obtained an arrest warrant for Buie and his alleged accomplice. The officers entered Buie's house to execute the arrest warrant, and one officer shouted into the basement announcing his presence and asking anyone to come out. Buie emerged and was apprehended. Later, another officer entered the basement "in case there was someone else down there." *Id.* at 328. That officer did not find anyone else in the basement, however, he did find inculpatory evidence in plain sight.

The Supreme Court in *Buie* held that "[a] 'protective sweep' is a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or

others," which "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 326. A "protective sweep … occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime." *Id.* at 333. In addition, the Supreme Court noted that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf,'" raising the risk of "[a]n ambush." *Id.* The Supreme Court explained that "[w]e are quite sure … that the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after and while making, the arrest." *Id.* at 334.

Accordingly, the Court articulated the following rules in *Buie*: First, "the authorities are entitled to search 'incident to the arrest … as a precautionary matter and without probable cause or reasonable suspicion, … closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Jones*, 667 F.3d at 483 (quoting *Buie*, 494 U.S. at 334). Second, "the officers are entitled to perform a further 'protective sweep,' beyond the immediately adjoining areas, when they have 'articulable facts which, taken together with the rational inferences from which those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.* (quoting *Buie*, 494 U.S. at 334). However, the Court cautioned that such a protective sweep is "circumscribed," and that it extends "only to a cursory inspection of those spaces where a person may be found," and lasting "no longer than it takes to complete the arrest and depart the premises." *Id.* (quoting *Buie*, 494 U.S. at 335–36).

7

<u>Reasoning</u>

The Court has considered the video evidence presented, the documents submitted in connection with the Government's response to the motion to suppress, the testimony of Officer John Pavia, and the arguments of the parties.

The Court finds that the officers conducted a valid protective sweep under *Buie*. To begin, Officer Hubbard conducted his protective sweep of the hotel room, it lasted just over one minute. Gov't Ex. 4 at 1:55–3:05. The protective sweep lasted no longer than needed to dispel the reasonable suspicion of danger. *See Buie*, 494 U.S. at 335–36. Moreover, Officer Hubbard's protective sweep of the hotel room was appropriately "limited to 'a cursory inspection of those spaces where a person may be found.'" *United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir. 2012) (quoting *Buie*, 494 U.S. at 335–36). Officer Hubbard announced his presence when he entered the hotel room, and he first proceeded toward the back of the hotel room where he could observe the space on the far side of the two beds, as well as the space between the beds. Gov't Ex. 4 at 1:50–2:10. He paused in between the beds and appeared to shine his flashlight under the bed as well as on various items on the floor. *Id.* at 2:10–2:18. Officer Hubbard turned around and the narcotics were located in plain view on a desk opposite the beds. *Id.* at 2:18–2:32.[2] Then Officer Hubbard returned to the front of the room where Officer Pavia and Ms. Brannan were located. *Id.* at 2:32–2:48. During the course of this protective sweep, Officer Hubbard inspected these "spaces immediately adjoining" the place where Ms. Brannan was being questioned and Defendant Simonton's detention[3] and were spaces "from which an attack could be immediately launched." *Buie*, 494 U.S. at 334.

---

[2] Defendant does not dispute that the narcotics (methamphetamine) were in plain view.

[3] Defendant does not argue that the *Buie* protective sweep doctrine is limited to circumstances involving arrests, and even if he did, the Court notes and follows "[t]he vast

Officer Pavia then conducted a brief protective sweep of the bathroom before letting Ms. Brannan in to use it get changed,[4] where he immediately found a firearm on the sink. Gov't Ex. 4 at 3:05–3:15. (Officer Pavia: "If you don't mind stepping out here, I'll check the bathroom real quick, we'll give you some clothes and you can get changed in there as long as there's nothing in the bathroom we can't have you around … yep, a gun. Exactly why we weren't letting her in here."). This was also a valid protective sweep, lasting no longer than was necessary to dispel the risk of danger, and appropriately limited in scope to spaces immediately adjoining the place of Ms. Brannan's questioning and Defendant Simonton's detention from which an attack could be launched or danger presented to the officers. *See Buie*, 494 U.S. at 334.

Defendant argues that the officers had no basis to believe that there was anyone else in the hotel room, relying particularly on the fact that Defendant Simonton and his codefendant Brannan told the officers that they were the only ones in the hotel room. *See, e.g.*, Gov't Ex. 4 at 1:20–1:30, 1:45–1:55. Significantly, however, the officers were not required to accept the truth of their statements. *Laudermilt*, 677 F.3d at 611 (reversing decision granting motion to suppress relating to a protective sweep; explaining that "[t]he district court placed undue importance on Laudermilt's decision to inform the officers that only his special needs brother was in the house," because the "officers are not bound by a suspect's statement"); *Solis-Alarcon v. United States*, 662 F.3d 577, 611 (1st Cir. 2011) (noting, in upholding protective sweep, that "[t]he officers

---

majority of circuit courts to have considered the issue have upheld protective sweeps conducted in non-arrest situations." *United States v. Portis*, 407 F. App'x 669, 671–72 (4th Cir. 2011) (unpublished).

[4] Ms. Brannan was wearing a towel during the initial minutes of her encounter with the officers, as she had either just gotten out of (or was just getting into) the shower when they knocked on the hotel room door. The officers promptly called a female officer to remain with Ms. Brannan as she changed, outside of their presence, once they conducted the protective sweep(s) of the hotel room.

were not required to accept plaintiffs' word that [the suspect] was absent"). And in any event, the Government only relies on the prong of *Buie* permitting authorities to do a protective sweep "*as a precautionary matter and without probable cause or reasonable suspicion*, … closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Jones*, 667 F.3d at 483 (quoting *Buie*, 494 U.S. at 334) (emphasis added). The focal point of the Court's inquiry therefore concerns the location and scope of the protective sweep and adherence to the requirements set forth in *Buie*, and not whether the officers had reasonable suspicion in this case that anyone else was in the hotel room.

      Defendant also argues that the officers were not actually conducting a valid protective sweep because they could have, but did not, look in a wardrobe in the hotel room that may have been large enough for someone to hide. In Defendant's view, Officer Hubbard's failure to look in the wardrobe effectively demonstrates that the protective sweep was really only a pretext to conduct a warrantless search of the hotel room. The Court disagrees with Defendant's argument that this fact demonstrates that the protective sweep was pretextual. Having considered the entirety of the officers' actions, the Court concludes that the protective sweep of the room was objectively reasonable and that any failure to eliminate every single hiding place in the room— here, specifically the wardrobe—does not negate the otherwise objectively reasonable protective sweep. *See United States v. Winston*, 444 F.3d 115, 120 (1st Cir. 2006) (rejecting argument that protective sweep was pretextual because "the agent did not descent cautiously into the basement and that agents did not conduct a sweep of the second floor"). The Court will not "second guess the agents as to how to conduct a protective sweep," as Defendant would invite this Court to do, where the officers actions were "objectively reasonable given the circumstances and constraints within which they operated." *See id.* Finally, to the extent that Defendant argues that Officer

Hubbard conducted too broad or expansive of a protective sweep of the hotel room, significantly the hotel room in this case was "small enough that all of it 'immediately adjoin[s]'" the space where Ms. Brannan was being questioned and Defendant being detained that it "constitute[d] a spaces or spaces 'from which an attack could be immediately launched.'" *United States v. Thomas*, 429 F.3d 282, 287 (D.C. Cir. 2005) (quoting *Buie*, 492 U.S. at 334) (holding that where an "apartment is small enough" to satisfy that standard, "then the entire apartment is subject to a limited sweep of spaces where a person may be found"). Under these circumstances, the entirety of the hotel room could be subject to a protective sweep.

For these reasons, the Court finds that the officers conducted a lawful protective sweep within the ambit of *Buie*, and accordingly, Defendant's motion to suppress must be **DENIED**. Dkt. 54.

It is so **ORDERED**.

The Clerk of Court is directed to send a certified copy of this Memorandum Opinion & Order to all parties.

Entered this **7th** day of February, 2023.

*[signature]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE